May it please the Court, Joel Mullen on behalf of TriMet. I'd like to reserve five minutes at the end of my record. You can do that. I should also say, although we've allocated 20 minutes on this case, a lot of that was due to the size of the record, and I think we've all been through the record, so just fair warning on that. Thank you, Your Honor. The fundamental error of the District Court was in finding that there was a surety ship relationship between CRM and TriMet. The District Court acknowledged that Modification No. 1 to the rail car contract was intended to be a fix, a technical fix to a problem that was created by the plaintiff, by CRM. The District Court acknowledged that the parties did not intend to create a surety ship relationship. Well, District Court said it was created by that Modification No. 1? That's what the District Court found. Because why? Because it increased the risk? No, I think the District Court's rationale was that somehow, and I'll quote the District Court, the Court said that there's no serious dispute that, pursuant to Modification No. 1 and the letter of credit, that TriMet had recourse against CRM 2. So I think the fundamental finding was that the modification gave us recourse against CRM 2, and I would turn that around, and I would say there's no serious dispute that, pursuant to Modification No. 1 and the letter of credit, TriMet had absolutely no recourse against CRM 2. Why do you say that? First of all, what page is that on, what you just read? I've got the Federal Supplement decision here, and that is on page 1153 of the FSUP decision. The judge, after going through his rationale, says, there can be no serious dispute that, pursuant to the plain language of Modification No. 1 and of the letter of credit, TriMet had recourse against CRM with respect to a maximum $3 million owed by Colorado Railcard to TriMet. Give me the page, and I've got the District Court's original opinion. Original opinion. That's okay, just give me the citation. It's at 715 FSUP 2nd at 1153. So, what are you saying? The District Court equated recourse against a standby letter of credit to recourse against a CRM collateral? Correct, and that is absolutely incorrect. And you think that's a legal error? I think it is absolutely a legal error. And as, I mean, what we had recourse against was KeyBank. We had recourse against KeyBank that was to pay us, and we had no recourse against CRM 2. And if ever there was a... ER 29 and 30 is one of them. And if ever there was proof that we didn't have recourse against CRM 2, it's the fact that we're here, and that we had to go through a year and a half of litigation before the court released the funds from KeyBank. We had no recourse against CRM 2. And a very instructive case in this regard is the California Supreme Court's decision in the Western Security Bank case. And what happened in Western Security Bank was that California, and I'm not a California lawyer, but California has an anti-deficiency provision in it on foreclosures. And the mortgagor, I think that's the right term of art, posted a letter of credit. And the issue was whether or not by allowing a draw against the letter of credit, there was a violation of the anti-deficiency rule on the theory that that was the property of the mortgagor. And what the Western Security Bank case held was no. It was not the property of the mortgagor. It was recourse against a letter of credit. And so I would say that this is a case, and letter of credit law is one of those maybe rare instances where, to some extent, form controls substance. And that's what letter of credit is all about, and that's what Article V is about, because what it does is it permits the parties to draw on letter of credit without worrying about extraneous relationships. We had to worry about our relationship with Colorado Rail Car, with whom we had a direct contract. We had to worry about whether or not when we drew on the letter of credit, we properly certified that it was in default of the rail car contract, that we properly certified that we suffered damages of $3 million. But letter of credit law, I would suggest, would be thrown in a tizzy if what we now have to worry about are these extraneous relationships as existed between CRM II, its own investors. You know, the fact is that CRM II didn't have any assets. What was posted were the assets of its shareholders, its shareholder securities accounts, that to require us to get involved in that relationship would throw the law into a tizzy. So you're basically saying this sort of what's going on over here in a different arena can't alter the actual primary relationship. So under this reasoning, every time a third party furnishes a standby letter of credit, it automatically becomes a surety. I think that's the teaching of the district court, and I think that's the position the plaintiffs take, and that can't be right. That doesn't seem right to me. There's no distinction between being a surety and, you know, a signature on a letter of credit. That's exactly right, Your Honors. And if you look at the definition of applicant in the UCC in Article V, and this is Section 5-102A, this is the definition. It says, The term includes a person who requests an issuer to issue a letter of credit on behalf of another if the person making the request undertakes an obligation to reimburse the issuer. Exactly our situation. And so what you would have to find in order to affirm the district court is that in that definition, what the drafters of Article V intended was to always create this surety-ship relationship. And it's interesting because on appeal, CRM 2, I suggest, does not ask the court to affirm the district court's reasoning. At page 15 and 16 of their briefing, what they do is they take the position that it was at the time that CRM 2 undertook the obligation to secure the letter of credit that the guarantee relationship was created. And that's exactly how they put it in their brief. And if that's the case, then that means that every time you have the circumstance suggested by 5-102A, you've got a guarantee. And that cannot be right. We've cited to the court the myriad of cases, the myriad of treatises, that chastise anyone who suggests that the letter of credit relationship creates a guarantee relationship. Now, it is true, as CRM points out, that in most of those cases, what they're talking about is the issuer to the beneficiary in our case. But if the issuer, the entity against which we have the right to grab the money. That's KeyBank. That would be KeyBank. If KeyBank wasn't a guarantor, how could these people out here possibly be a guarantor of this circumstance? Because if the notion is that we have recourse against assets, the assets we have recourse against was KeyBank. And in that circumstance, it's never been held to guarantee. And if I understand the facts, what KeyBank got in order to protect itself was 125% of the value of the face of the letter of credit, in order to make sure that if it had to pay off, it would. Exactly right. And it didn't get it from CRM. It got it from CRM's shareholders, against whom no one has ever suggested we had any recourse whatsoever. And they're really the parties that stand behind it. So there's only one court decision we found that specifically addressed this circumstance. And that's the In re Carli Capital case. And the bankruptcy court and the district court both took a look at that issue. And they both concluded that this cannot create this guarantee relationship. And they went through, you know, I don't think I can improve upon the analysis that they put forward. And they talked about that this does implicate the independence principle, precisely because it requires us to look into these third-party relationships. So our position is fundamentally here, the district court made that error. And one other point on this issue. It is a matter of practice. And we all know this when we go out and try to get a loan or guarantee a loan. Anyone in that circumstance asks for a waiver of surety ship defenses. And, you know, it's without regard to honor, promise, modification of the underlying agreement, all of those things. So what this court would have to find in order to rule for them is that in every instance where there is this type of transaction, what you have to do is go out and get all of those waiver of surety ship defenses. And it would just, again, I keep on using the word tizzy, but it would change the way that letter of credit law has operated and how they actually operate in commercial function. This is a question of Oregon law. No Oregon case on point, is there? There is not an Oregon case on point. Do you ever think about certifying this to the Oregon Supreme Court? I had not, Your Honor. Do you think it's or you think the answer is so self-evident that it would be a waste of time? Well, I would say, I guess I would say that. But I think that there's even a more, I mean, even sort of a more important reason. And that is that the Uniform Commercial Code is a uniform act. And this has application throughout the United States. Now there may be some deviations in state law. The UCC provisions that Oregon adopted don't deviate substantially from the Uniform Code? They do not deviate substantially. Based on the letters of credit? Correct. Article V, I believe, is about 98% exactly the same. And so I think that what you do is if you, I mean, I don't think it's necessary. But I think that this is really an issue of import, of commercial import. And that this Court's decision will make a difference in the commercial sector. So, and I guess let me add one more reason why the District Court is wrong. And that is because basically what the plaintiffs have argued for is they get a get-out-of-jail-free card here. That what they're able to do is say there were modifications to this underlying agreement, you know, you didn't talk to us about them, and therefore we're relieved of our obligations. And maybe in some context that is, it can be understood, though guarantee law has gone a long way from that point since the Marshall Wells case that they cited back in 1916, I think it is. But they had remedies here. And so by depriving them of this guarantee, this surety relationship, is not depriving them of remedies. Section 5-110 of the Uniform Commercial Code provides that when we presented for payment the letter of credit, we made certain warranties. First and foremost, we warranted that there was no fraud, no material fraud in connection with the presentation. We warranted that there was a default under the letter of credit and that we had been default under the underlying contract and that we had been damaged to the tune of $3 million. If that was fraudulent, they have remedies. They can say we breached the warranty. It was not fraudulent. It was absolutely what happened here. The second thing they could do is come in and say that we somehow were in breach of the underlying rail car contract. The only party that was in breach of the underlying rail car contract was Colorado Rail Car Corporation because it had failed to provide us with what we were looking for, could not complete the cars, and we were forced to go ahead and spend additional money. So they had warranties. They could have pursued those warranties, and they didn't, and they went in this other direction, and the law does not allow it. What do we do with the PMA? I'm with you up to the point where if TriMet – forget about the PMA. If TriMet had simply gone to KeyBank and made the warranties that you just outlined, KeyBank presumably would have immediately released the money, or perhaps there would have been litigation. But the PMA significantly complicates the analysis, doesn't it? Well, I don't think it does, Your Honor, because what was going on was that Colorado Rail Car was incapable of completing the contract. It did not have the money to complete the contract. I understand. We understand from a commercial standpoint why TriMet did what it did. That seems eminently reasonable. But the problem that I'm having is that, as I understand it, under Oregon law, there are circumstances that will change the obligation of the, I guess it would be the applicant in this case, if there are changes beyond simply extending the due date of the letter of credit. See, that's not – I disagree, Your Honor. So you don't think that the entry into the PMA had any impact whatsoever on KeyBank's obligation to pay on the letter? It only becomes an issue if you accept the notion that there was this surety. Surety, okay, that's what I wanted to ask. So your view is the PMA doesn't impact the threshold decision of is this a surety or not. If we were to disagree with you and say, well, it is a surety, then the PMA comes in to say, does that kind of rejigger the risk calculus, and is there a question of fact about that, or is there not, because you're still on the hook for the same $3 million? That's correct, and we obviously take the position, and we presented evidence that I would suggest the district court disregarded or chose not to regard, and that was that at the time the PMA was entered into, the Colorado Railcar had a secured creditor. The secured creditor was undersecured to the tune of $15 million. This is HILCO? This is HILCO, that's correct, Your Honor. So what happened was there was no, we would say, material impact on CRM by virtue of the PMA because the only thing it did was create the possibility that the company might survive, but under no circumstances did it decrease their ability to get money back from Colorado Railcar because Colorado Railcar did not have the economic ability to do so. But the key point here is you don't have to reach that point unless you find that there was a surety-ship relationship. Okay, do you want to save your time? Thank you very much, Your Honor. May it please the Court, my name is Tim DeYoung. I represent CRM Collateral. TriMet has phrased the issue for the panel today as the fundamental issue of whether or not CRM Collateral was a surety. On that issue, the district court applied Oregon law. The district court cited two cases from Oregon, Chada v. Tapp and Twombly. There is also a third case that we have cited, Atterbury from the Ninth Circuit, applying Oregon law. Those courts apply a very simple rule, which is the rule that Judge Papik in the district court applied and quoted in his decision finding a surety-ship. And I quote from the Chada v. Tapp opinion on this point, quote, the three parties in surety-ship are the surety, the principal, and the creditor. The surety is the person who is bound on an obligation from which another, by the discharge of a surety, excuse me, by the discharge of a duty, should relieve him. The principal is the person who, in the solution of the rights and the duties of the parties, should bear the ultimate burden unless excused for some reason personal to himself. In other words, you have a surety-ship where a party agrees to be responsible for the obligations of another. But you're not taking the position that every time a letter of credit is entered, a surety-ship is created, are you? We certainly are not, Your Honor. One thing that strikes me about what you just read us is that we have four parties here. We have a bank, which is the issuer of the letter of credit. We have a beneficiary, which is TriMet, and we have an applicant, which is CRM, too. But we also have CRM, which is performing on this rail car contract, which the letter of credit is being offered to help secure the completion of that contract, right? Correct. So it's not the mere posting of a letter of credit didn't create the surety-ship, did it?  The reason being is that we have Modification 1. In this case, unlike any other case that TriMet has cited, we actually have a direct contract between the surety, the principal, and the beneficiary, the creditor, TriMet. It is Modification 1, and Modification 1 says, Applicant, that's my client, and contractor, Colorado Rail Car, agree for the benefit of TriMet that a default under this contract, this is the rail car contract, by contractor shall also constitute a default under this contract by applicant, CRM 502. But I thought the reason for doing that was, and I don't mean any disrespect to whoever did the due diligence because I'm not sure that there was a breach there, but I thought there was a problem with regard to authority to bind CRM 2 under the letter of credit. Your Honor, that is not, respectfully, that is not the situation that led to Modification 1. It wasn't a question of authority. It was a question of the fact that the letter of credit originally was drafted with language that said to draw on the letter of credit, TriMet would have to certify that the applicant, CRM collateral, was in default on the contract. When what they really meant was CRM, right? For the rail company. Yeah. Perhaps. That's what the letter of credit was supposed to be posted for. The record does not disclose how the original letter of credit came into existence and was drafted. I thought the record suggested that the performance bond was too expensive because of the precarious financial condition of Railcar, and so it was decided that a letter of credit would suffice in the amount of $3 million. But the problem was that whoever drafted the papers didn't make sure that it was clear that TriMet could draw on the letter of credit when Railcar defaulted. TriMet certainly made the decision that it would accept a letter of credit in the amount of $3 million. Well, let me ask the question in a different way. That in a perfect world, the terms of the letter of credit would have been drafted to make clear, which I thought is what Modification 1 ultimately did, that in the event that Railcar defaulted and TriMet suffered damages of up to $3 million, it could draw on the letter of credit. Wasn't that the whole purpose for Modification 1? The purpose for Modification 1 was, and Judge Papich, the district judge,  TriMet's lawyer, Mr. Mullen's partner, who drafted Modification 1 and was advising TriMet contemporaneously during these events, testified that there were a series of options for TriMet to address the letter of credit. One was to amend the letter of credit or obtain a new letter of credit, and TriMet didn't like that option because that would have required them to involve KeyBank, the issuer, in the situation. So TriMet made a deliberate, conscious decision to instead enter into a direct contract and in plain black and white make my client responsible for the defaults of calling the letter of credit. No, but the very next sentence of that same modification says the only purpose of making that a default is to allow TriMet to draw on the standby letter of credit. That's the only purpose of that. Right? Isn't that what it says? That is correct. The purpose of Modification 1 is to give TriMet access to the collateral. To the standby letter of credit. Isn't it really to align the parties? It's a letter of credit and it aligns the parties. That's what the modification does, doesn't it? It doesn't give TriMet access to collateral. It gives TriMet access to the standby letter of credit. Collateral has no other obligation except the standby letter of credit. That's why I can't understand why it becomes a surety. What did it undertake besides furnishing the letter of credit? Tell me what collateral undertook. It undertook by contract to stand for the defaults of Colorado Railcar. To do what? Stand for the defaults. No, stand for the default only for the purpose of allowing TriMet to draw on the letter of credit. There's no question. That's all it did. Well, let me just step back. Our potential liability. Well, so if the railcar people default, could TriMet have sued your client for the defaults? Not the letter of credit, but just for substantive defaults? Breach of contract. Breach of contract. Yes. Under what document? Under the modification one because we are in default. They wouldn't do that because that's the beauty of a letter of credit. It's just like cash. Never mind they wouldn't do that. Where do they have the right to do that? Because it says the only purpose of making the default is to permit a draw on the letter of credit. Your Honor, respectfully, I disagree. It says a default by railcars shall be a default by collateral, and it says we are a party to the contract solely for the purposes of this paragraph. Okay. No, no, the parties agree that the purpose of that sentence, the parties agree that the purpose of that sentence is to allow TriMet to draw on the standby letter of credit. That's all they can do. It does not say that, Your Honor. What does it say? It says applicants shall be a party to the contract solely for purposes of this paragraph, the paragraph defining us as. What are you reading? I am reading modification one, Your Honor. TriMet. Well, you know the sentence you read that says a default by the contractor shall also constitute a default under the contract by the applicant? Correct. What's the sentence that immediately follows that? Yes, Your Honor, you're correct. I apologize. You are reading the sentence in between the one that I am focusing on. My apologies. And Judge Toshima's sentence says. It says the parties agree that the purpose of the immediately preceding sentence is to allow TriMet to draw on the SBLC in the event of a default under this contract by contractor. And then read the last sentence of the paragraph. The last sentence says applicants shall be a party to the contract solely for the purposes of this paragraph and the SBLC and shall not have any rights or obligations under the contract. Okay, so that's precisely my question was could TriMet sue them under the contract? And I assume if that happened, you would pull that out and say, Your Honor, look to the last sentence up there where we actually never obligated ourselves under the contract. All we obligated ourselves was vis-à-vis the letter of credit. Oh, no, they could have sued us for a default, and in fact they did. There's a claim pending in this court that the district court denied that we are in default under the contract. And TriMet moved for summary judgment on that, I believe. As a practical matter, TriMet would not do that because that is why it wanted a letter of credit was because a letter of credit allows the beneficiary to go to the bank and get the money and hold it while any disputes about the underlying obligations, underlying contract are resolved.  Are you saying that you stepped into the shoes of Colorado Railcar for all purposes? No. No. I hope not. I may not understand your question, Your Honor. Well, I'm trying to understand what the scope of this contract is, this modification, whether it's really I think to align the parties for the letter of credit purposes. You're trying to make it something larger that puts you into the surety ship world, correct? In my opinion, it is a classic surety ship contract. Well, but if you're correct, and isn't it true what I intimated to Mr. Mullen that then every letter of credit signed by a third party makes that the applicant for the letter of credit a surety? I don't believe that is true, Your Honor. It equates a letter of credit with a surety ship. I don't believe that is true, Your Honor. For example, you can have a letter of credit that the creditor doesn't know exists. You can have collateral that's put up that the, I mean, this is one of the things, one of the requirements for a surety ship is that the creditor knows that the surety ship exists and that the surety is there and has guaranteed the obligation. So you can have a secret collateral being put up. That would be one situation where you wouldn't have it, but the district court, Your Honor. The problem, though, as I understand it, the commercial reality was that Colorado Rail could not obtain its own letter of credit from KeyBank because of its financial conditions. So the best they could offer was to create this bankruptcy remote entity, CRM2, which posted its own collateral with KeyBank in order to secure the standby letter of credit for the benefit of TriMet in the event that RailCard defaulted. And it seems to me that the real problem here was that the original letter of credit terms did not reflect the intentions of the parties, which was to allow TriMet to draw on the letter of credit in the event that RailCard couldn't complete the underlying contract. And when TriMet's lawyers realized that there was a problem, it proposed Modification 1, which, as Judge McEwen correctly describes it, aligned the parties so that it was clear that TriMet could draw on the letter. Isn't that what happened here? I don't believe that the history of how the original letter of credit came into existence and how it was drafted that way is in the record, Your Honor. But if the sole purpose and sole impact of aligning the parties was to align the parties, then the way to do that would have been to amend the letter of credit, not to enter into a new contract, make us a party to the contract. If you amend the letter of credit, who would be a party to that?  I'm sorry, Your Honor. Would the bank be a party? To amending the letter of credit? Yes, it's the issuer. It would have to. So everybody wants to not have to go through that again because the reality is that they're going to be able to draw on it if there's a default, right? Or the bank's going to charge more money, another $45,000 to issue a new letter of credit. I mean, basically, I assume as a practical reality, you don't want to have to go to the bank again at that stage. That's certainly correct. TriMet did not want to go to the bank. That is in the record. That is their testimony. Right. So the question is by bypassing the bank, was a surety created? I think the question is whether or not we can Discontract. we can discount and disregard the fact that we have a contract, Modification 1, which on its face is a surety ship, expresses a surety ship, and whether or not we can make that go away because, as Your Honor characterized it, its only purpose was, and as TriMet argues, was to align the parties or fix a mistake. It is still a contract with the force of a contract which satisfies the definition. Okay, so just let me go back because I want to make sure I understand your argument. Looking solely at the Modification 1, which is the basis for the surety ship, is that right? Yes. What are the elements of a surety ship that that contract satisfies, just so I make sure I understand that? It makes CRM Collateral responsible for the defaults of Colorado Railcar. How does it do that? All it does is, what it does is it gives TriMet the right to call on the letter of credit if there's a default. How does that make CRM Collateral responsible? They've already posted the letter of credit, so they have that obligation already. And by TriMet's position, that letter of credit that had been posted was worthless because it presented a factual impossibility. Well, that goes to the worth of the letter of credit. It doesn't go to the liability of CRM Collateral. Without? To TriMet. Your Honor, respectfully, without Modification 1, my client had no liability. I agree. But it doesn't have any either with this. It's the letter of credit that's liable, not your client. But a letter of credit is just the same as cash. There's no difference between putting up a letter of credit. I know, but you don't have the cash. The bank has it. So no further liability is being imposed on you. The cash is certainly in a repository. What was the additional consideration that CRM 2 obtained by entering into Modification 1 that CRM obtained? CRM 2. What was the consideration for that modification? Well, if it's a completely separate contract. That's a question, Your Honor, that nobody has raised yet. Well, I'm raising it now. I know. I just don't know the answer. Well, let me suggest an answer to you. CRM 2 posted its investors' assets originally to secure a $3 million line of credit from KeyBank. That was the intent in posting those securities. Correct. Right? Correct. And as I read this document, all it does is clarify what the parties had always intended, which was that if Railcard defaulted and TriMet was damaged, it could call on the letter of credit. So this document didn't change the status quo that the parties had originally contemplated. It may not have changed what the parties contemplated, Your Honor, but it did change the legal rights and obligations of the parties. Well, I understand your position is that we loaned our security to KeyBank, but we were never really on the hook right out of the box, because had there been a call on the letter of credit at that point, we would have said, Not our responsibility. There's nothing here that ties us to a default by Railcard. So, therefore, KeyBank, give us our securities back. We're not obligated. But this document makes clear that, yes, you are, that if KeyBank has to pay out its $3 million, then they're going to collect on the collateral that they originally obtained to issue the letter of credit. And I see no additional consideration from CRM 2's perspective. The consideration is that we now have a valid three-party relationship, and my client would be entitled to continue to accept the benefits. But your client was still getting the quarterly payments, the $75,000 a quarter. Certainly, Your Honor, could have said this letter of credit, they had a right to accept or reject the letter of credit, and that's how this came up. They saw the way that the thing was drafted, and they said, Wait, we've got to fix this. We're not going to take it that way. But making the arrangement valid, as you put it, doesn't make it a surety ship. It just makes it a valid letter of credit. Isn't that right? I disagree, because we have a surety ship contract. How can we disregard that? How can we pretend like that doesn't exist? We have a surety ship contract where? Modification 1. Although all it does is, the way you put it, make the previously entered into letter of credit arrangement valid. That also makes it? That is not how I put it. I put it as it makes my client responsible for the default Colorado rail car, and it provides TriMet with a legal remedy being recourse to the letter of credit. But that's what CRM 2 did when it thought it was doing when it went to the bank the first time. We don't need modification 1. Or the district court erred in concluding that there was a material change in the relationship of the parties that occurred when modification number 1 was entered. That's a separate issue, Your Honor. That's an issue of one of the elements of the discharge defense. You have to first find that we're a surety, and then you have a test that says if there's a material change that is done without the consent of the surety, and it increases the risk to the surety. But that's the PMA. Yeah, that's the PMA. CRM consented to this, did it not? It absolutely did. It signed it. It signed modification 1, correct. Those are two separate issues. And I assume, although apparently you say it's not in the record, that there's a similar document or signature by somebody on behalf of CRM 2 with Key Bank when they obtained the letter of credit in the first place. That there's a signature by them? That there's a contract between the bank and CRM 2 that induced Key Bank to issue the letter of credit. Yes, that's correct. Okay. And that contract says that a default by the applicant, my client, entitles you to pay to TriMet. Okay. And so that was a different contract than what happened with modification 1. Okay. I think I understand your position. My time is up. Thank you. Thank you. Anything further? No. Thank you for a very interesting Oregon law case. The case of CRM Collateral v. Tri-County Met is submitted and we're adjourned for the morning.
judges: Tashima, McKeown, Tallman